NAPOLEON LIVESTOCK AUCTION,
INC., Plaintiff, Appellant and
Cross-Appellee,

v.

Pius C. ROHRICH, Defendant,

Clemens Rohrich, Defendant
and Appellee,

First National Bank a/k/a First National
Bank of Linton; David A. Erickson;
and Kenneth A. Meier a/k/a K.A. Mei-
er, Defendants, Appellees and Cross-
Appellants.

Civ. No. 11346.

Supreme Court of North Dakota.

April 29, 1987.

Vogel Law Firm, Mandan, for plaintiff, appellant and cross-appellee; argued by Jos. A. Vogel, Jr.

Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Linton, for defendant Pius C. Rohrich; no appearance.

Francis C. Rohrich, Linton, for defendant & appellee Clemens Rohrich; argued by Francis C. Rohrich.

Pearce & Durick, Bismarck, for defendants, appellees and cross-appellants; argued by David E. Reich.

ERICKSTAD, Chief Justice.

Napoleon Livestock Auction, Inc., appeals from the order of the District Court for the South Central Judicial District entered on June 9, 1986, that denied its motions for a new trial, and to amend its complaint to conform to the evidence under Rule 15(b), N.D.R.Civ.P. Napoleon Livestock also appeals from the order of the district court entered on July 21, 1986, that awarded partial attorney's fees and expenses to Clemens Rohrich under Section 28–26–01, N.D.C.C.

First National Bank of Linton, David A. Erickson and Kenneth A. Meier, officers of the Bank, cross-appeal from the order of the district court entered on July 14, 1986, that denied the Bank's motion for attorney's fees and expenses. We affirm the orders of the trial court.

Pius C. Rohrich is a farmer engaged primarily in the buying, raising, and selling of cattle. The First National Bank of Linton provided Pius with operating revenue and maintained a security interest in Pius' cattle. The Bank kept a record of the approximate number of cattle at Pius' farm by noting in its comments sheets the number of cattle purchased and sold by Pius.

On November 23, 1983, Napoleon Livestock and Pius entered into an arrangement in which Napoleon Livestock issued a check in the amount of $257,000 payable to Pius as an advance for the purchase of approximately 700 calves that Pius was to deliver to Napoleon Livestock in two weeks. Pius took the $257,000 check to the Bank and allowed the Bank to apply it against Pius' debt with the Bank.

Pius did not deliver the 700 calves pursuant to the November 23, 1983, agreement and Napoleon Livestock did not demand delivery of the 700 calves until after April 2, 1984. In fact, the calves were never delivered to Napoleon Livestock. In the interim, the calves were commingled with other cattle on Pius' farm.

Between November 25, 1983, and April 2, 1984, Pius apparently purchased approximately 626 head of cattle and sold approximately 212 head of cattle according to the Bank's records. On April 2, 1984, Don Hauck, president of Napoleon Livestock, and David A. Erickson, vice-president of the Bank, counted approximately 670 to 700 head of cattle at the Pius Rohrich farm. According to the Bank's comments sheets, Pius should have had in excess of 1,400 head of cattle at his farm on that date. The remaining cattle at Pius' farm were sold in the fall of 1984 and the Bank claimed the proceeds pursuant to its security interest.

On May 4, 1984, Napoleon Livestock commenced an action in conversion, among other claims, against Pius and Clemens, his father, to recover for the loss of the 700

calves that it claimed the $257,000 check purchased.

After extensive discovery, Napoleon Livestock brought its case to trial on April 8, 1986, alleging in its fifth amended complaint eight causes of action against Pius, Clemens, the Bank, and its officers, Meier and Erickson. The complaint alleged (1) breach of contract by Pius individually and by Clemens as Pius' partner, (2) fraud by Pius and the Bank, (3) breach of good faith or fraud by the Bank and the Bank's officers, (4) conversion by all the defendants, (5) breach of an oral contract of which Napoleon Livestock was a third-party beneficiary, (6) violation of Section 41–03–50, N.D.C.C., by Pius, (7) claim to property and proceeds of Pius' under Section 36–21–18, N.D.C.C., and (8) an implied trust arising out of fraud or mistake under Section 59–01–06, N.D.C.C., involving Pius and the Bank. It sought to recover compensatory and punitive damages from all the defendants.

Through separate stipulations, all of Napoleon Livestock's claims against Pius and Clemens, except for the conversion claim, were dismissed. The trial court, pursuant to the Bank's motion for a directed verdict, dismissed all of Napoleon Livestock's claims against Erickson and Meier, and also dismissed the claims against the Bank for fraud, punitive damages, and breach of good faith. All of Napoleon Livestock's claims were dismissed except for claims four, five, and eight above.

At the close of trial, a special verdict form was submitted by the trial court to the jury. During deliberations the jury asked the trial court, "Does this question [special verdict form question 4] pertain to 700 yearlings?" The trial court answered:

"The word 'calves' in Question (4) refers to the same calves mentioned in questions (1), (2) and (3).

"The only calves that could have been converted would be the ones Pius allegedly contracted to sell to Napoleon Livestock under the November 23, 1983 agreement.

"Calves bought by Pius or added to his herd after that date could not be converted as Napoleon Livestock would have no right to possession of these after acquired calves since they would not have been included in the 700 to which the alleged contract referred."

The jury, on April 11, 1986, answered the special verdict form[1] and determined es-

1. The special verdict form and the jury's answers to it are as follows:

"Adhering to these instructions, we, the Jury, impaneled and sworn in the above-entitled action, answer the questions as set forth herein in accordance with the instructions already given as follows:

"(1) By the greater weight of the evidence, do you find the November 23, 1983, agreement between Napoleon Livestock and Pius Rohrich to be a loan or a contract for the sale of 700 calves?

ANSWER: Sale
(Loan or Sale)

NOTE: If you answer Question (1) as a loan, omit Question (2) through (5) and go on to Question (6). If you answer 'sale,' go on to Question (2).

"(2) By the greater weight of the evidence, were the 700 calves to be delivered under the contract identified so as to pass title to Napoleon Livestock on November 23, 1983?

ANSWER: Yes
(Yes or No)

NOTE: If you answer Question (2) 'No,' omit 3, 4 and 5 and go on to Question (6). If you answer 'Yes,' go on to Question (3).

"(3) By the greater weight of the evidence, has the plaintiff proved that the bank authorized the sale of the 700 calves by Pius Rohrich to Napoleon Livestock so as to terminate its security interest in those calves?

ANSWER: Yes
(Yes or No)

NOTE: If you answer 'No,' omit Questions (4) and (5). If you answer 'Yes,' go on to Question (4).

"(4) By the greater weight of the evidence, has the plaintiff proved that any of the following defendants converted the calves as per the instruction on page 13?

| Pius Rohrich | Yes |
| Clemens Rohrich | No |
| First National Bank | No |

Answer 'Yes' or 'No' for each.

NOTE: If you answer 'no' for all defendants, omit Question (5); if you answer 'yes' for any defendant, go on to Question (5).

"(5) (A) State the amount of damages you award to plaintiff as a result of the conversion of the calves.

ANSWER: $ 257,000.00

(B) If you award damages, do you, in your discretion, award interest at the rate of 6 percent from the date of the conversion?

ANSWER: No
(Yes or No)

(C) If so, what do you determine to be the date of conversion?

ANSWER: _____.

sentially that the November 23, 1983, agreement between Napoleon Livestock and Pius was a contract for the sale of 700 calves; that the 700 calves were identified so as to pass title to Napoleon Livestock on November 23, 1983; that the Bank authorized the sale of the 700 calves so as to terminate its security interest; that Pius converted the calves; that Clemens and the Bank did not convert the calves; and that Napoleon Livestock was not a third-party beneficiary. The jury found Pius liable to Napoleon Livestock for $257,000 in damages. On June 4, 1986, the trial court entered judgment implementing the jury's findings of facts.

On June 5, 1986, judgment was entered dismissing Napoleon Livestock's claim for an implied trust.

On May 21, 1986, Napoleon Livestock moved to amend its complaint under Rule 15(b), N.D.R.Civ.P., to allege the creation of a constructive trust which it claimed should be imposed on the proceeds from the sale of cattle discovered at Pius' farm on April 2, 1984. On May 21, 1986, Napoleon Livestock also moved for a new trial arguing that the trial court's supplemental instruction relating to the conversion question was an incorrect statement of law or because the jury was confused by a typographical error in question 4 of the special verdict form. On June 9, 1986, the trial court denied the motions after making the following preliminary statement:

"Hearing on the plaintiff's motions to amend complaint and for a new trial was had before the Court on May 29, 1986, in Linton, North Dakota, the Honorable William F. Hodny presiding. The Court, having considered the pleadings, evidence and argument of counsel for the parties, upon the entire record, and having determined that the plaintiff's motion to amend complaint is not within the scope of Rule 15(b), N.D.R.Civ.P., and that the proposed amended complaint does not raise an issue tried by express or implied consent of the parties and that plaintiff elected its remedy by seeking recovery at law, and having further determined that the response given by the Court to the jury's question was a correct statement of law, and that the jury was not confused by a typographical error appearing in Question No. 4 on the special verdict form."

Napoleon Livestock appeals from the order denying its motions to amend and for a new trial.

On April 18, 1986, Clemens moved to recover attorney's fees. On July 22, 1986, the trial court entered an order pursuant to Section 28–26–01(2), N.D.C.C., that granted partial attorney's fees to Clemens. The trial court reasoned that Clemens was entitled to partial attorney's fees because Napoleon Livestock's claims for relief against Clemens for partnership liability and punitive damages were frivolous. Napoleon Livestock appeals the trial court's award of partial attorney's fees to Clemens.

On May 1, 1986, the Bank moved to recover attorney's fees incurred in the defense of all claims against Erickson and Meier individually, and in the defense of the claims for fraud, bad faith, and punitive damages against the Bank. On July 18, 1986, the trial court entered an order that denied the Bank's motion for attorney's

---

"(6) By the greater weight of the evidence, has the plaintiff proved itself to be a third-party beneficiary of an agreement between Pius Rohrich and the First National Bank under which it was agreed that the $60,633.90 would be paid by the bank?

ANSWER: ___No___
(Yes or No)

NOTE: If you answer 'no,' omit Question 7 and go on to Question 8.

"(7) (A) Do you, in your discretion, award interest at the rate of 6 percent per annum to Napoleon Livestock on the $60,633.90 from the date of its issue?

ANSWER: _____
(Yes or No)

"(8) (A) By the greater weight of the evidence, has First National Bank proved itself entitled to any damages under its counterclaim?

ANSWER: ___No___
(Yes or No)

(B) If yes, what amount do you award?
ANSWER: $ _____

(C) Do you, in your discretion, award interest at the rate of 6 percent per annum to First National Bank from the date of the withholding?

ANSWER: _____
(Yes or No)

"Dated this _11th_ day of April, 1986, at Linton, North Dakota.

/s/ _____

FOREMAN OF THE JURY"

fees. The Bank cross-appeals from this order.

Five issues are raised on appeal:

## I

Whether or not the supplemental instruction submitted by the trial court correctly states the law of conversion.

## II

Whether or not the trial court erred when it denied Napoleon Livestock's motion for a new trial premised on alleged jury confusion due to a typographical mistake in question four of the special verdict form.

## III

Whether or not the trial court erred when it denied Napoleon Livestock's motion to amend its complaint alleging a constructive trust.

## IV

Whether or not the trial court erred when it awarded partial attorney's fees to Clemens.

## V

Whether or not the trial court erred when it denied the Bank's motion for attorney's fees.

The first issue is whether or not the trial court erred in its supplemental instruction by advising the jury that the 700 calves identified with the contract of November 23, 1983, were the only calves that could be converted.

Napoleon Livestock does not assert that the trial court incorrectly stated the law of conversion in its initial instructions,[2] but does assert that it committed error in its supplemental instruction. It asserts that once the jury found that the cattle were identified and that the Bank had waived its security interest any subsequent commingling or replacing of cattle was no defense to its right to recover the fair and reasonable market value of the converted cattle from Rohrich and the Bank.

■ We have said: "Conversion consists of a positive tortious act, a tortious detention of personal property from the owner, or its destruction, or a wrongful exercise of dominion over the property inconsistent with, or in defiance of, the rights of the owner." *Christensen v. Farmers State Bank of Richardton,* 157 N.W.2d 352, 357 (N.D.1968); *See also* 18 Am. Jur. 2nd *Conversion* § 1 (1985).

■ In this case, Napoleon Livestock's entitlement to possession arose from the jury's determination that the 700 calves purchased by Napoleon Livestock on November 23, 1983, were identified with the contract because "there were only 700 calves [in the possession of Pius on November 23, 1983,] and the parties intended all or almost all of these calves to be sold under the contract."[3] Thus, on November

**2.** The trial court's jury instruction regarding conversion reads as follows:

"ESSENTIAL ELEMENTS OF CONVERSION

"In order to establish conversion against any of the defendants, the plaintiff must prove by the greater weight of the evidence the following elements:

"(1) That plaintiff has a right to possession of the calves because you have found:

(A) That the agreement of November 23, 1983, was a contract for the sale of calves; and

(B) That they were identified to the contract; and

(C) That the bank had by implication consented to their sale to plaintiff; and

"(2) That the defendant committed an act which impaired the possessory rights of plaintiff or wrongfully exercised assumption of authority over plaintiff's calves which deprived plaintiff of possession."

**3.** The trial court instructed the jury on "Identification of Cattle" as follows:

"In order for title to have passed, there must have been an identification on November 23, 1983 of the cattle included in the contract. In other words, the agreement of the parties must have been specific enough so that each party knew which cattle were to be sold under the contract. If it was a contract to sell any calves that might be delivered to Napoleon Livestock by Pius Rohrich, there was no identification. If it was a contract to sell 700 calves out of a much greater amount in the ownership or possession of Pius Rohrich, there was no identification of the cattle.

23, 1983, Napoleon Livestock had a "special property and an insurable interest" in the 700 calves pursuant to Section 41–02–49(2–501), N.D.C.C., upon which to predicate its claim of conversion. *See Miles v. Starks*, 590 S.W.2d 223 (Tex.Civ.App.1979), writ referred no reversible error, *cert. denied*, 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1979).

To establish that the trial court erred in its supplemental instruction, Napoleon Livestock relies heavily upon *Ontario Livestock Commission Co. v. Flynn*, 256 Iowa 116, 126 N.W.2d 362 (1964). We think its reliance on *Flynn* is misplaced. In *Flynn* the livestock commission company (Ontario) alleged conversion of two shipments of cattle by Kastner, an alleged fraudulent purchaser, and Flynn, a livestock commission merchant. Kastner commingled Ontario's cattle with other similar cattle and delivered the mixed cattle to Flynn, who sold them and paid Kastner the proceeds of the sale less his commission. Flynn argued, in his motion for a directed verdict and apart from the issue that Ontario consented to the sale, that at the time the cattle were commingled Ontario would not have had a possessory interest entitling it to bring an action in conversion because it would not have been able to identify its cattle.

The Iowa Supreme Court, in finding Flynn's argument that the mere commingling of the cattle defeated a claim for conversion to be without merit, said:

"The general rule is a claimant for conversion must establish the identity of the property claimed. *Harlan Production Credit Ass'n v. Schroeder Elevator Co.*, 253 Iowa 345, 348, 112 N.W.2d 320, 322, and citations. *It cannot be contended the cattle plaintiff sold to Kastner were not identified.* There is no evidence plaintiff consented to any commingling of either shipment of cattle or had any part therein. In our opinion the fact Kastner and Flynn replaced some of the cattle acquired from plaintiff with others affords no defense to plaintiff's action to recover the fair and reasonable

market value of the cattle shipped to Kastner." [Emphasis added.] 126 N.W.2d at 367–68.

■ The Iowa Supreme Court in *Flynn*, however, did not depart from the general rule requiring identification of the alleged converted property which they had earlier stated in *Harlan Production Credit Ass'n v. Schroeder Elev. Co.*, 253 Iowa 345, 348, 112 N.W.2d 320, 322 (1961). *See* 89 C.J.S. *Trover & Conversion* § 132 (1955) ("In actions for conversion, the identity of the property must be established by a preponderance of the evidence; and any evidence which reasonably satisfies the jury of the identity of the property converted is sufficient.").

In *Flynn*, 126 N.W.2d at 367, the court determined that Ontario established the identity of its property because there was "substantial evidence" that Ontario's cattle came into Flynn's possession as part of a larger shipment.

In this case, Napoleon Livestock relies upon circumstantial evidence to suggest that the 700 calves purchased in November 1983 were the same or part of the same herd of cattle which were discovered at Pius' farm in April 1984. The Bank asserts the cattle on Pius' farm in April were cattle other than the 700 calves that Napoleon had purchased.

■ Generally, the degree of particularity with which identification must be made in proof of conversion will vary with the circumstances of the case and where "there is opportunity for commingling of animals of the plaintiff with other animals of like breed and answering the same general description, identification must be made with reasonable certainty." *Burgess v. Small*, 151 Me. 271, 117 A.2d 344, 345 (1955); *See also* 18 Am. Jur.2d *Conversion* § 171 (1985). Additionally, the plaintiff must recover on the strength of his own title, without regard to the weakness of that of his adversary, and he must show that he has either a general or special property interest in the thing converted

However, if there were only 700 calves and the parties intended all or almost all of these

calves to be sold under the contract, there was a sufficient identification."

and the right to its possession *at the time of the alleged conversion.* Denver Livestock Comm. Co. v. Lee, 18 F.2d 11, 16, reh'g denied, 20 F.2d 531 (8th Cir.1927). See also Lettinga v. Agristor Credit Corp., 686 F.2d 442 (6th Cir.1982); Genesee Merchants Bank and Trust Co. v. Grand Packing Co., 8 Mich.App. 568, 155 N.W.2d 193 (1968); Hance v. Tittabawassee Boom Co., 70 Mich. 277, 38 N.W. 228 (1888); 18 Am. Jur.2d *Conversion* § 75 (1985).

In *Lettinga v. Agristor Credit Corp., supra,* the plaintiff (Lettinga) sought to recover for the wrongful conversion of dairy cows by Agristor Credit Corporation. Lettinga had sold Larry and Karen Recker, dairy farmers, ninety-six dairy cows over a period of more than two years and received payment for forty-four cows. During this time, Agristor Credit Corporation loaned the Reckers money for farm operating expenses but required as a condition for the loan that the Reckers incorporate their farm. As part of the incorporation, the Reckers transferred 100 cows and other farm assets to Larry J. Recker Farms, Inc. Some of the Reckers' cows were not assigned to the corporation at that time but were commingled with those owned by the corporation. Recker Farms entered into a security agreement with Agristor, giving Agristor a blanket security interest in all the cows belonging to the corporation. Agristor properly perfected its security interest. When Lettinga discovered that he failed to perfect his purchase money security interest, he attempted to recover for the loss of the fifty-two cows in conversion. Lettinga sought to treat the cows as fungible so that he could recover on a percentage basis. The Court of Appeals, in rejecting Lettinga's argument, concluded:

"We are, however, unable to accept Lettinga's underlying premise that the cows should be treated as fungible. Under the Uniform Commercial Code, collateral subject to a security interest, including cows, must be reasonably identified. *In re Reiser,* 20 U.C.C.Rpts. 529 (1976). *See also Genesee Merchants Bank & Trust Co. v. Grand Packing Co.,* 8 Mich. App. 568, 573, 155 N.W.2d 193 (1967). Similarly, to maintain a cause of action

for conversion, an interest in specific, identifiable personalty must be pleaded and proved. *Hance, supra* [70 Mich. 277, 38 N.W. 228 (1888)].

"To prove a loss of property in which Lettinga had an interest, three factors must converge: a particular cow must have been sold by Lettinga, owned by the Reckers individually and subject to one of Lettinga's security interests. Lettinga would have no right to recover for the conversion of cows sold by him and owned by the corporation or cows sold by him and owned by the Reckers individually but not subject to one of his security interests.

"There is sufficient evidence in the record to support the conclusion that four cows in the commingled herd satisfied these three requirements. Lettinga introduced the test records of the veterinarian who examined each cow removed from the Reckers' farm for brucellosis. The ear tag numbers of four of the cows tested matched four ear tag numbers on Lettinga's financing statements. Lettinga is entitled to recover for these four cows.

"Beyond the identification of these four cows, Lettinga has simply failed to carry his burden of establishing that particular cows in which he had a security interest were taken by Agristor." 686 F.2d at 448. [Footnotes omitted.]

Neither Napoleon Livestock nor the Bank relies in this case on the provisions of the Uniform Commercial Code as contained in Chapter 41–09, N.D.C.C. [U.C.C. Art. 9]. We have, therefore, made no search of Chapter 41–09 for possible application.

The court in *Lettinga* determined that Article 9 of the Uniform Commercial Code did not govern and applied instead the Michigan law of conversion. The court reasoned:

"Michigan's version of Article 9 of the Uniform Commercial Code, Mich.Comp. Laws Ann. §§ 440.9101 *et seq.*, governs priority conflicts between parties that have secured and other interests in the same collateral. *Id.* A perfected security interest in collateral prevails over all

subsequent security interests with the exception of a purchase money security interest in the same collateral. *Id.* § 440.9312(4)(5). If parties have security interests in different collateral, however, there is no priority conflict and the Uniform Commercial Code does not apply. The disposition of property subject to a security interest by one who has no interest in that property is governed by the Michigan law of conversion." 686 F.2d at 445.

■ We believe that the reasoning of the Court of Appeals in *Lettinga* is sound and should be applied in this case. Applying the non U.C.C. law to maintain a claim for conversion, an interest in specific, identifiable personalty must be pleaded and proved. Accordingly, Napoleon Livestock had the burden of identifying the 700 calves at the time of the alleged conversion.[4]

Napoleon Livestock acknowledges that the date of the alleged conversion against the Bank and Clemens was on or after April 2, 1984. Napoleon Livestock apparently did not take any action to strengthen its interest in the 700 calves. It did not brand or record the brand of the cattle, nor did it direct Pius to segregate the 700 calves from other cattle. Rather than strengthening its interest, Napoleon Livestock's actions served to weaken it. Because Napoleon Livestock allowed Pius to retain possession considerably past the contemplated delivery date, the subsequent commingling of the 700 calves with other cattle made Napoleon Livestock's burden of identifying its cattle more difficult. Actually, Napoleon Livestock made little effort at trial to identify its 700 head of cattle as of April 2, 1984.

Don Hauck, on direct examination explains why he believes the 700 calves identified with the November 23, 1983, contract were the same cattle discovered at Pius' farm on April 2, 1984:

"Q. Now, Mr. Vogel asked you some questions and I believe you said you purchased 700 cattle on November 23, 1983.

"A. Yes.

"Q. And those are 700 cattle that Pius Rohrich had at the time you—at that time on November 23, 1983.

"A. Yes.

"Q. Okay. Now, when you went out to the farm on April 2, 1984, are you saying those are the same cattle that Pius Rohrich had on November 23, 1983?

"A. Yes.

"Q. The same cattle. How do you know? Were you present just a few minutes ago when Pius Rohrich testified that between November—

"THE COURT: We have two questions pending now. We won't know which one he's answering.

"Q. [Mr. Reich continuing] How do you know those 675 and 700 head that you found out on their farm on April 2, 1984, were the same cattle that Pius Rohrich had and that you claim you bought on November 23rd, 1983?

"A. Because they were Charolais, Simmental and black baldie cross cattle.

"Q. Now, Pius Rohrich between November 23, 1983 and April 2, 1984, he purchased 626 head of cattle, and he ran those cattle in and out of his herd, mingled them together. How do you know those were the same cattle that were out there on the 2nd?

---

**4.** *Compare* Section 41–09–36 (9–315), N.D.C.C.:
"41–09–36. (9–315) Priority when goods are commingled or processed.
1. If a security interest in goods was perfected and subsequently the goods or a part thereof have become part of a product or mass, the security interest continues in the product or mass if:
 a. The goods are so manufactured, processed, assembled, or commingled that their identity is lost in the product or mass; or
 b. A financing statement covering the original goods also covers the product into which the goods have been manufactured, processed, or assembled.
In a case to which subdivision b applies, no separate security interest in that part of the original goods which has been manufactured, processed, or assembled into the product may be claimed under section 41–09–35.
"2. When under subsection 1 more than one security interest attaches to the product or mass, they rank equally according to the ratio that the cost of the goods to which each interest originally attached bears to the cost of the total product or mass."

"A. They were. The heifers—he had some out at Luger's, and basically those were all yearling steers and they were cross-bred cattle like he had bought.

"Q. How do you know those are the same cattle he bought during that intervening period, over 600 head of cattle?

"A. It's the same kind of cattle that they bought. They are all the same.

"Q. Same kind, but do you know they are the same cattle?

"A. They never sold any of those other than the 700 he sold to me.

"Q. Did he sell cattle to other sale barns?

"A. Did he? Huh?

"Q. Did he sell cattle to other sales barns?

"A. He bought, sold the ones at Herreid and the ones at Wishek.

"Q. There were a number of transactions between November 23rd and April 2nd, 1984.

"A. Yes."

On the other hand, the Bank asserts, through Erickson's testimony, that the cattle at Pius' farm on April 2, 1984, were cattle other than the 700 calves purchased by Napoleon Livestock:

"Q. And then on April 2nd, 1984, you and Don Hauck went out to Pius Rohrich where he kept the cattle on his father's farm.

"A. Yes.

"Q. And you took a head count.

"A. Yes.

"Q. And the head count was Don Hauck, 674 head of livestock and your head count was a little over, in excess of 700.

"A. Correct.

\* \* \* \* \* \*

"Q. Now, when you got out to the farm on April 2nd, the cattle you found out there—is it your understanding that these were the same cattle for which Napoleon Livestock is claiming that $257,000 check was given?

"A. No. As far as the bank was concerned, they were different cattle."

The Bank's Exhibit 53, which was received as evidence by the trial court and verified by Pius' testimony, shows that Pius purchased 626 head of cattle and sold 212 head of cattle from November 23, 1983, to April 2, 1984.

We agree with the trial court that there was a dispute in the evidence as to what Pius did with the original 700 calves purchased by Napoleon Livestock on November 23, 1983. Based upon the record, the jury could have found that some of the cattle had been sold, other cattle purchased, all had been commingled, and that Napoleon Livestock failed to identify its 700 calves sufficiently to prove conversion of them by the Bank which held a security interest.

■ We conclude that the trial court's supplemental instruction correctly stated the law of conversion, and that it was a question of fact for the jury to resolve whether or not the cattle discovered on April 2, 1984, at Pius' farm were the same or part of the same 700 calves sold through the November 23, 1983, contract.

The second issue is whether or not the trial court abused its discretion when it denied Napoleon Livestock's motion for a new trial premised upon alleged jury confusion caused by a typographical error in question 4 of the special verdict form.

A motion for a new trial must be based upon one or more of the grounds enumerated in Rule 59(b), N.D.R.Civ.P., *Merrill Iron & Steel v. Minn-Dak Seeds, Ltd.*, 334 N.W.2d 652 (N.D.1983). Our review of an order denying a new trial is to determine only if there was a manifest abuse of discretion. *Merrill Iron & Steel*, 334 N.W.2d at 655; *Dahlen v. Landis*, 314 N.W.2d 63, 67 (N.D.1981); *Stee v. "L" Monte Industries, Inc.*, 247 N.W.2d 641, 645 (N.D.1976).

Question four of the special verdict form reads as follows:

"(4) By the greater weight of the evidence, has the plaintiff proved that any of the following defendants converted the calves as per the instruction *on page 13*?

Pius Rohrich — 
Clemens Rohrich — 
First National Bank — 

Answer 'Yes' or 'No' for each." [Emphasis added.]

Napoleon Livestock argues that the trial court committed reversible error by submitting question 4 to the jury because the instruction on page 13 pertains to Napoleon Livestock's third-party beneficiary claim, and not to the requirements for conversion which were on page 15. The Bank asserts that any error committed by the trial court in submitting question 4 was harmless. Napoleon Livestock asserts that "[i]t must be presumed that the jury, following the instructions of the Court as set out on the Special Verdict Form went to page 13 and read that instruction when it determined its answer for Question No. 4."

The trial judge, in deciding that the jury was not confused by the typographical error, said:

"The instruction on page 13 deals with third-party beneficiary. That third-party beneficiary dealt with the $60,000 claim; it did not deal with the $257,000 claim. The mistake is there, and I have to assume the responsibility for it. But we had a very intelligent jury, they asked pertinent questions, including Question No. 2, which dealt with Question 4. I do not feel, and I find that they were not confused and that they saw past the typographical error and confined themselves to the conversion theory and I do exercise my discretion and deny the motion for new trial.

"If I had any doubt that the jury was confused, I would order a new trial. Such was not the case here. The attorneys argued these issues very extensively. Some of them argued instructions to the jury. The jury had the instructions to follow along. Each had their own copy of the instructions. In spite of the mistake, they were not misled and they understood the case and understood which theory they were applying."

As the typographical error which referred to the wrong page of the instructions was such an obvious error, we have no difficulty in concluding that it did not confuse the jury and accordingly we find no abuse of discretion in the trial court's denial of a new trial on this ground.

The third issue is whether or not the trial court erred when it denied Napoleon Livestock's motion to amend its complaint pursuant to Rule 15(b) of the North Dakota Rules of Civil Procedure [5] to allege a constructive trust premised on Napoleon Livestock's assertion that the Bank was unjustly enriched. The crux of Napoleon Livestock's position is that the Bank was paid twice for the same cattle. Napoleon Livestock asserts that the Bank was paid once when it accepted the $257,000 check from Pius and applied it against Pius' outstanding debt on November 23, 1983, and secondly, when the Bank claimed the proceeds from the sale of Pius' cattle situated on Pius' farm on April 2, 1984.

Under Section 59–01–06, N.D.C.C., a constructive trust may be imposed by the courts in order to do equity and prevent unjust enrichment when title to property is acquired by fraud, duress, undue influence, or is acquired or retained in violation of a fiduciary duty or confidential relationship. *Radspinner v. Charlesworth*, 369 N.W.2d 109, 115 (N.D.1985); *Wildfang-Miller Motors, Inc. v. Miller*, 186 N.W.2d 581 (N.D. 1971). The party seeking imposition of a constructive trust has the burden of proving the existence of the trust by clear and convincing evidence. *Radspinner v. Charlesworth, supra.*

The trial court denied Napoleon Livestock's motion to amend made on May 21, 1986, 41 days after the trial, because the

---

5. Rule 15(b), N.D.R.Civ.P., reads in part as follows:

"*(b) Amendments to Conform to the Evidence.* When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."

court concluded that the issue whether or not the Bank was unjustly enriched was not tried by the express or implied consent of the parties, and because Napoleon Livestock had made an election of remedies by pursuing damages at law.

▮▮▮▮ Generally, the decision whether the issue was tried by express or implied consent is a matter within the sound discretion of the trial court and will not be reversed on appeal unless an abuse of discretion is shown. *Hardin v. Manitowoc-Forsythe Corp.,* 691 F.2d 449, 457 (10th Cir. 1982); 6 Wright and Miller, *Federal Practice and Procedure:* Civil § 1493 (1971). Implied consent is established where the parties recognized that the issue entered the case at trial and acquiesced in the introduction of evidence on that issue. *Hardin,* 691 F.2d at 457; *Ellis v. Arkansas Louisiana Gas Co.,* 609 F.2d 436, 439–40 (10th Cir.1979), *cert. denied,* 445 U.S. 964, 100 S.Ct. 1653, 64 L.Ed.2d 239 (1980). Because the purpose of Rule 15 is to bring the pleadings in line with the issues that were actually developed at trial, it does not permit amendment to include collateral issues which may find only incidental support in the record. *Hardin, supra; Ellis, supra.*

In order to find an abuse of the trial court's discretion, we must determine initially whether or not the parties recognized that the issue of unjust enrichment entered the case at trial, and secondly, whether or not the parties acquiesced in the introduction of evidence which would prove that the Bank was paid twice for the same cattle.

▮▮▮ In this case, the record does not sufficiently establish that the issue of unjust enrichment entered the case at trial. Counsel for Napoleon Livestock has not directed our attention, either in the briefs or in oral argument, to evidence in the record that establishes its assertion that the Bank was paid twice for the same cattle.

We conclude that the trial court did not abuse its discretion in denying Napoleon Livestock's motion to amend its complaint under Rule 15(b). Because this reason is sufficient to affirm the trial court's denial we need not consider the issue whether or not Napoleon Livestock's election to pursue damages at law barred its claim for equitable relief.

The fourth issue is whether or not the trial court erred in awarding partial attorney's fees to Clemens. Napoleon Livestock argues that the trial court's award of partial attorney fees does not meet the heavy legislative burden imposed by Section 28–26–01(2), N.D.C.C.

Generally, attorney's fees and costs are not allowable to the successful litigant unless provided by statute. *Matter of Estates of Gustafson,* 381 N.W.2d 208, 213 (N.D.1986); *Zuern v. Jensen,* 336 N.W.2d 329, 330 (N.D.1983); *Westchem Agricultural Chemicals v. Engel,* 300 N.W.2d 856, 859 (N.D.1980). Section 28–26–01(2) provides for an award of attorney's fees as follows:

"2. In civil actions the court may, in its discretion, upon a finding that a claim for relief was frivolous, award reasonable actual or statutory costs, or both, including reasonable attorney's fees to the prevailing party. Such costs may be awarded regardless of the good faith of the attorney or client making the claim for relief if there is such a complete absence of actual facts or law that a reasonable person could not have thought a court would render judgment in their favor, providing the prevailing party has in responsive pleading alleged the frivolous nature of the claim."

In 1977, the Legislature amended Section 28–26–01 to authorize a court to award attorney's fees "upon a finding that the pleading was frivolous." 1977 N.D.Sess. Laws, ch. 283, § 1. In 1979, the Legislature again amended Section 28–26–01 apparently to refine the 1977 amendment. The 1979 amendment reads in part as follows:

"2. In civil actions the court may, in its discretion, upon a finding that ~~the pleading~~ a claim for relief was frivolous, award reasonable actual or statutory costs, or both, including

reasonable attorney's fees to the prevailing party. Such costs may be awarded regardless of the good faith of the attorney or client making the claim for relief if there is such a complete absence of actual facts or law that a reasonable person could not have thought a court would render judgment in their favor, providing the prevailing party has in responsive pleading alleged the frivolous nature of the claim." 1979 N.D.Sess.Laws, ch. 372, § 1.

■ We believe the legislative intent of the 1979 amendment was to permit a court to separately consider the frivolousness of individual claims for relief. *See generally Stoll v. Adriansen,* 122 Wis.2d 503, 362 N.W.2d 182 (Ct.App.1984); *Strand v. Nelson,* 380 N.W.2d 906 (Minn.App.1986).

Napoleon Livestock also argues that the trial court's denial of Clemens' motion for summary judgment disputes the findings that there was no basis in law or fact supporting its claim of an ostensible partnership between Pius and Clemens and for an award of compensatory and punitive damages against Clemens.

Judge William W. Schwarzer, in his article "Sanctions Under the New Federal Rule 11—A Closer Look," 104 F.R.D. 181, 198 (1985), explains the relationship between motions for summary judgment and Rule 11 sanctions, which we believe relevant in determining the propriety of an award of attorney's fees under Section 28–26–01(2), as follows:

"Normally, although not necessarily always, a claim or defense so meritless as to warrant sanctions, should have been susceptible to summary disposition either in the process of narrowing issues under Rule 16 or by motion. Only in the rare case will the offending party succeed in delaying exposure of the baseless character of its claim or defense until trial. Permitting or encouraging the opposing party to litigate a baseless action or defense past the point at which it could have been disposed of tends to perpetuate the waste and delay which the rule is intended to eliminate. It also under-

mines the mitigation principle which should apply in the imposition of sanctions, limiting recovery to those expenses and fees that were reasonably necessary to resist the offending paper." [Footnotes omitted.]

The record establishes that Clemens filed his initial motion for summary judgment on July 2, 1984. Judge Larry M. Hatch denied Clemens' motion for summary judgment concluding that "genuine issues of material fact exist." On April 15, 1986, Clemens moved to renew his motion for summary judgment. Apparently, Judge William F. Hodny, who replaced Judge Hatch, did not fully consider Clemens' renewed summary judgment motion until after trial. Colloquy between the trial court and counsel for Napoleon Livestock illustrates this result:

"MR. VOGEL: ... I think to brief you on this, Your Honor, there was a previous motion by counsel for Clemens Rohrich, which was tried also to yourself, by Judge Hatch, for a motion to summary judgment—

"THE COURT: That motion never got before me, and it was delayed. And then I think he renewed it a couple days before we had our hearing, and I didn't have the motion before me.

"MR. VOGEL: And I made the same response I made to the previous motion.

"THE COURT: But I never really heard it.

\* \* \* \* \* \*

"THE COURT: The partnership summary judgment motion never got before the Court, it wasn't noticed in time."

■ As counsel for Napoleon Livestock continuously resisted the motion, and Judge Hatch's denial was early in discovery, we do not believe Judge Hodny's failure to deny the motion under the circumstances of this case should preclude an award of attorney's fees against a party for pursuing frivolous claims after subsequent proceedings made it apparent to the trial court that the claims were clearly frivolous.

Napoleon Livestock's allegations for punitive damages against Clemens, in para-

graph 41 of its fifth amended complaint, read as follows:

"In refusing to allow delivery of the cattle to the plaintiff, Pius Rohrich, Clemens Rohrich, and officers of the Bank, Meier and Erickson, were acting deliberately, fraudulently and maliciously towards the plaintiff. Therefore, plaintiff is entitled to recover damages under § 32–03–07 NDCC, in the amount of $500,000."

When asked by the trial court what evidence Napoleon Livestock had of fraud, oppression, or malice against Clemens, Napoleon Livestock answered:

"MR. VOGEL: I think there is some clear evidence of punitive damages on April 4th when Clemens Rohrich had no reason whatsoever to intervene between Pius Rohrich and Napoleon and the bank in terms of those cattle being picked up and taken to market.

"THE COURT: I know you didn't like what he did. But was it fraud, oppression or malice?

"MR. VOGEL: It was oppression.

"THE COURT: By whom?

"MR. VOGEL: By Clemens Rohrich against Napoleon Livestock, and then buttress it by the fact he went to the bank two days later and signed a $345,000 guaranty so Pius Rohrich could continue to keep those cattle out of the possession of Napoleon."

Napoleon Livestock essentially argues that on April 4, 1984, Clemens oppressively interfered by guaranteeing Pius' debt to the Bank so that the Bank would not force the sale of the cattle at Pius' farm. Clemens testified that he guaranteed Pius' debt to the Bank so that the cattle could be sold in the fall instead of the spring to allow the cattle to gain weight and thus bring a better price.

There must be a specific finding of oppression, fraud, or malice, actual or presumed, by the trier of fact to support an award of punitive damages. Section 32–03–07, N.D.C.C.; *Bismarck Realty Co. v. Folden*, 354 N.W.2d 636, 643 (N.D.1984); *Dahlen v. Landis*, 314 N.W.2d 63 (N.D. 1981). "Oppression," as used in the con-

text for punitive damages, means "subjecting a person to cruel and unjust hardship in conscious disregard of his rights." *Richardson v. Employers Liability Assurance Corp.*, 25 Cal.App.3d 232, 246, 102 Cal. Rptr. 547, 556 (App.1972).

■■■ In this case, Clemens' action guaranteeing Pius' debt did not fit the definition of oppression so as to warrant continuing a claim for punitive damages after subsequent discovery should have made it apparent to Napoleon Livestock that such a claim was frivolous. In light of the record, we agree with the trial court that Napoleon Livestock's claim for punitive damages "is frivolous and is based on such a complete absence of law and fact that a reasonable person could not find for the plaintiff [Napoleon Livestock]."

The trial court also awarded Clemens partial attorney's fees incurred in defense of Napoleon Livestock's claim that Pius and Clemens were partners. At the hearing, the trial court commented on Clemens' motion for partial attorney's fees as follows:

"Well, this partnership one does trouble me, and it seems to me the evidence was so weak even prior to trial, especially if you look at what elements are required to prove an ostensible partnership. *Oelkers vs. Pendergrast* case, [73 N.D. 63, 11 N.W.2d 116 (1943)] and the other one is *Luithle vs. Schlickenmayer* [*Schlichenmayer v. Luithle*, 221 N.W.2d 77 (N.D.1974)], they've all been cited so many times in this case I'm not going to go into those. But there has to be some conduct that justified the plaintiff in relying on this partnership. There was absolutely no such conduct here that I could see that would justify them in relying on any kind of a partnership at the time they dealt with Pius. They didn't rely on any belief that Clemens was going to pick up this contract if Pius didn't. They dealt with Pius. They said they trusted Pius.

"Then when it comes to trial, they charge this ostensible partnership. In my opinion, that allegation of ostensible partnership was based on such a com-

plete absence of actual fact and law that a reasonable person could not render a verdict in plaintiff's favor and was frivolous. Attorney fees are justified."

In *Schlichenmayer v. Luithle*, 221 N.W.2d 77, 82 (N.D.1974), we identified the elements of an ostensible partnership as follows:

"As to third persons, there may be an 'ostensible partnership' whereby persons who are not in fact partners may be held liable as such by reason of their conduct if the conduct justifies a third party in believing that the partnership exists and justifies him in relying on that belief in acting to his detriment. But to establish an ostensible partnership, the person claiming the existence of it must prove that the persons to be charged as partners either held themselves out to be partners or knowingly or negligently permitted others to do so. Circumstantial evidence to establish such an ostensible partnership must be inconsistent with any other reasonable hypothesis than the existence of a partnership. *Oelkers v. Pendergrast*, 73 N.D. 63, 11 N.W.2d 116 (1943). The mere cosigning of a note does not make a cosigner a partner with the other signers." *Oelkers v. Pendergrast, supra.*

We believe the record clearly establishes that Napoleon Livestock relied not upon an ostensible partnership between Pius and Clemens, but upon the trust it had in Pius. George Bitz, Hauck's partner, testified concerning the November 23, 1983, contract to sell the 700 calves, as follows:

"Q. Was Pius selling his cattle to Napoleon prior to this?

"A. He had sold some cattle at our place. He had sold some cattle at Wishek, sold some cattle at Herreid. I imagine he sold some cattle at other places. He did sell cattle to our place, yes.

"Q. Did discussion get down to 700 calves or yearlings?

"A. Yes. He said he would sell us 700 steers.

"Q. Do you know, did he tell you how much money he needed for them?

"A. $257,000.

"Q. Based on the description of the cattle and the price that was discussed and the weight, did it appear that 700 cattle would generate that kind of income?

"A. The way the cattle were described and the way the price was, the cattle should have brought more than the $257,000.

"Q. How much more?

"A. Well, the cattle could have brought like probably $270,000, but Pius still owed me 8500. And I said, 'Pius, if you bring the 700 cattle in, when would you bring them in?' He said, 'I'll bring them in this coming Thursday.' And I said, 'Okay.' I said, 'If it's fine with Don, it's sure fine with me.' And we always got along super good. 'Don, what do you think?' He shrugged his shoulders and said, 'I don't know. I suppose we probably could.'

"Then I said, 'Pius, you still owe me $8500 from the money I borrowed you last spring. If you bring the cattle in, we give you $257,000 today, what about my $8500? What are you going to do?'

"He said, 'George, I won't screw you.' I said, 'I have no doubt in my mind. I know you won't.' And that was the way it was more or less left.

"Q. You said you had pretty good—

"A. I've trusted him more than I've trusted any man in this world.

"Q. What was the next thing? Obviously the number of head were agreed upon and they were described to you. Were you satisfied that the cattle were in existence?

"A. Yes. Well, I knew, you know, 700 cattle and the kind of cattle that he had bought, and I had seen him buy, would have been worth that kind of money.

"Q. In your years as an auctioneer and operating your own sale barn, does it happen very often that you purchase cattle on that basis?

"A. I've bought a lot of cattle. I've bought cattle over the telephone without looking at them. I've bought cattle from farmers with just a handshake and a

check and said you deliver them. I've bought them over the telephone without looking at them. I suppose when it gets down to it, I've done it all because I trust people."

 After an examination of the record, we agree with the trial court that the partnership claim against Clemens was frivolous because there was no basis in law or fact to establish that Napoleon Livestock relied upon an ostensible partnership between Pius and Clemens on November 23, 1983.

The fifth issue is whether or not the trial court erred when it denied the Bank's motion for attorney's fees. The Bank argues that it is entitled to recover attorney's fees incurred in the defense of Napoleon Livestock's claims against Erickson and Meier individually, and Napoleon Livestock's claims against the Bank for bad faith, fraud, and punitive damages. The Bank asserts a right to attorney's fees under Sections 28–26–01(2) and 28–26–31, N.D. C.C.,[6] and Rule 11, N.D.R.Civ.P.[7]

Inasmuch as the aforementioned statutes and Rule 11, N.D.R.Civ.P., all relate generally to the same subject matter, we think it appropriate to, if possible, apply the same standard of review in analyzing the trial court's application of the statutes and Rule. As we often must rely on Federal Courts for guidance in construction of our Rules, and as our Rules of Civil Procedure are for the most part patterned after the Federal Rules, and as our Rule 11 and the Federal Rule 11 are almost identical, we think it appropriate to apply the standard of review laid down in *Golden Eagle Distributing Corp. v. Borroughs Corp.*, 801 F.2d 1531, 1538 (9th Cir.1986), where the Court said:

"The courts of appeals have given some consideration to standards of review in sanction cases. Because Rule 11 mandates sanctions when it is violated, the prevailing view of the courts of appeals is that whether specific conduct violated the Rule is a legal question which must be reviewed de novo. *Zaldivar*, 780 F.2d at 828 [*Zaldivar v. City of Los Angeles*, 780 F.2d 823 (9th Cir. 1986) ]; *Eastway*, 762 F.2d at 254 n. 7 [*Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985) ]. If there is any dispute as to factual determinations concerning the conduct, the determinations would be reviewed under a clearly erroneous standard. *Zalvidar*, 780 F.2d at 828. Since the district court has wide discretion in determining what sanction should be imposed for violation of the Rule, however, the appropriateness of the sanctions must be reviewed under an abuse of discretion standard.

6. Section 28–26–31, N.D.C.C., reads as follows:
 "*28–26–31. Pleadings not made in good faith.* Allegations and denials in any pleadings in court, made without reasonable cause and not in good faith, and found to be untrue, shall subject the party pleading them to the payment of all expenses, actually incurred by the other party by reason of the untrue pleading, including a reasonable attorney's fee, to be summarily taxed by the court at the trial or upon dismissal of the action."

7. Rule 11, N.D.R.Civ.P., reads as follows:
 "Every pleading of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion of a party or upon its own motion, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee."
 "[Amended effective March 1, 1986.]"

*Id.; Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1175 (D.C.Cir.1985); *Eastway*, 762 F.2d at 254, n. 7."

In the hearing, the trial court determined that some of Napoleon Livestock's claims for relief "came awfully close to the point where they were frivolous." However, the trial court exercised its discretion and declined to award attorney's fees to the Bank. The trial court said:

"28–26–01 allows the Court to award attorney fees in its discretion. In other words, even if I found that a claim was frivolous, I still can exercise my discretion and not award them.

"28–26–31 requires somebody to find that these pleadings were found to be untrue. Some of this was withdrawn, and he was pursuing, as he tells me, inconsistent theories. I have to allow attorneys to exercise some latitude in it. I'm not going to award attorney fees. I'm going to exercise my discretion and not award them, including under Rule 11.

"I feel that these pleadings came awfully close to the point where they were frivolous, and I could justify awarding them; but I don't think it falls quite in the clearcut part as in the partnership; and the facts in the case are somewhat muddled so that anything counsel did with reference to which they are entitled to in putting their case together would not be clearcut, so I'll deny attorney fees."

We agree with the trial court that "the facts in the case are somewhat muddled." The case was further complicated by Napoleon Livestock's several claims for relief. Napoleon Livestock's fifth amended complaint alleged eight claims for relief of which two, conversion and third-party beneficiary, were submitted to the jury for findings of fact, and one, implied trust, was determined by the court after trial. We note, at the outset and as preliminary to our examination of the trial court's denial of the Bank's motion for attorney's fees under Rule 11, that Napoleon Livestock apparently presented sufficient evidence at trial to get its third-party beneficiary and conversion claims to the jury. While this does not establish that Napoleon Livestock's claims against the bank officers and against the Bank for fraud and bad faith were not frivolous, it does indicate that Napoleon Livestock's complaint was not thought by the trial court to be wholly frivolous or the court might have dismissed them on its own initiative. It also establishes, apart from the alleged frivolous claims, that the Bank, Meier, and Erickson were all objects of Napoleon Livestock's lawsuit.

We note the Federal Rules Advisory Committee's caution that "[t]he court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the ... paper was submitted." 97 F.R.D. 165, 199 (1983). The Advisory Committee states that the rule "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *Id.*

On February 14, 1985, Napoleon Livestock served its amended complaint that added the Bank as a defendant to its original complaint against Pius and Clemens. On October 15, 1985, Napoleon Livestock filed a motion to amend its second complaint to name Meier and Erickson as defendants. On October 28, 1985, the Bank resisted Napoleon Livestock's motion to add Meier and Erickson and argued that "[a]ny liability which could be assessed against them under the allegation of the complaint would also be assessed against the Bank." On October 30, 1985, Napoleon Livestock served its reply brief and answered generally that the addition of Meier and Erickson was necessary "so the Court may grant full relief and adjust in one suit all rights of those interested" and to establish its claim for joint and several liability. On January 15, 1986, the trial court granted Napoleon Livestock's motion to amend.

In *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 801 F.2d at 1542, the Court concluded that "Rule 11 is intended to reduce the burden on district courts by sanctioning, and hence deterring, attorneys who submit motions or pleadings which cannot reasonably be supported in law or in

fact." In *Golden Eagle Distributing Corp., supra,* the Court determined that "Rule 11 does not apply to the mere making of a frivolous argument." The Court explained:

"The Rule permits the imposition of sanctions only when the 'pleading, motion, or other paper' itself is frivolous, not when one of the arguments in support of a pleading or motion is frivolous. Nothing in the language of the Rule or the Advisory Committee Notes supports the view that the Rule empowers the district court to impose sanctions on lawyers simply because a particular argument or ground for relief contained in a non-frivolous motion is found by the district court to be unjustified. In short, the fact that the court concludes that one argument or sub-argument in support of an otherwise valid motion, pleading, or other paper is unmeritorious does not warrant a finding that the motion or pleading is frivolous or that the Rule has been violated." 801 F.2d at 1540-41.

Because Rule 11 is not intended to apply to a particular ground for relief in a non-frivolous motion, we believe that the trial court did not err in denying the Bank's motion for attorney's fees under Rule 11.

Section 28-26-01(2) authorizes the court in its discretion to award the prevailing party attorney's fees "upon a finding that a claim for relief was frivolous." For the reasons given under Rule 11, we conclude that the trial court did not abuse its discretion by denying the Bank's motion for attorney's fees under Section 28-26-01(2).

▮ Section 28-26-31, unlike Section 28-26-01(2), does not contain discretionary language, but directs the court to award the payment of all expenses, including a reasonable attorney's fee, to the party having to respond to "[a]llegations and denials in any pleadings in court, made without reasonable cause and not in good faith, and found to be untrue." In *Matter of Estate of Nelson,* 281 N.W.2d 245, 250 (N.D.1979), we determined that under Section 28-26-31, adverse decisions do not, per se, entitle the prevailing party to an award of attorney's fees. We explained our conclusion as follows:

"The granting and the affirmance of summary judgment should not in itself be considered as an indication that the actions of Esther and Ruth justify the award of substantial attorney fees and costs. The right of litigants to have their day in court and the right to appeal if the litigants are dissatisfied with adverse results are prerogatives inherent in our judicial system. Even though this court affirmed the summary judgment because of deficiencies in the proof offered by Esther and Ruth, such action by our court is not indicative of a lack of reasonable cause, falsification, or bad faith on their part." 281 N.W.2d at 250-51.

The Bank argues "that in light of the Bank records provided to Napoleon Livestock pursuant to the May 10, 1985, Request for Production of Documents, the subsequent four amended complaints filed which continued to allege bad faith, fraud, and punitive damages on the basis of the Bank's records were not made with reasonable cause and not in good faith and were shown at trial to be untrue." The Bank asserts that "to prepare a defense against plaintiff's claim for fraud, it was necessary to try to determine the number of cattle Pius Rohrich had on November 23, 1983," and "[t]his required that many hours of time spent searching records of Pius Rohrich's cattle transactions."

Napoleon Livestock responds that it "was simply doing what the law [Rule 8, N.D.R.Civ.P.] permits, claiming alternative theories and claims for relief in order to avoid any potential splitting or omissions of claims."

▮ In this case, Napoleon Livestock had a legitimate interest in learning what happened to the 700 calves it purchased from Pius on November 23, 1983, which were to remain on Pius' farm until delivered to Napoleon Livestock. Those cattle were never delivered to Napoleon Livestock and yet the Bank recovered the proceeds from the sale of cattle that were found on Pius' farm on April 2, 1984.

What happened to those cattle was a question of vital importance to Napoleon Livestock and conversion by the Bank was a possibility when it is recognized that the Bank received the entire purchase price of the cattle sold to Napoleon Livestock. If Napoleon Livestock's allegations were, as the Bank suggests, untrue, unreasonable, and made in bad faith, then the Bank should have moved early in the proceedings and been successful in having them dismissed. Having failed in that, under the circumstances, we conclude that the trial court did not err in denying the Bank's motion for attorney's fees under Section 28–26–31.

For the reasons stated herein the judgments and orders of the trial court are affirmed.

GIERKE, VANDE WALLE, LEVINE and MESCHKE, JJ., concur.